lection of a party, of what happened eight years before, could be taken to destroy such a title, and taken, when his whole conduct seems to have proceeded on the ground that there was nothing wrong brought to his knowledge, and when the mouths of the only other parties present at the time are sealed in death, no title would be safe.

There is nothing in the case to show that Mrs. Moore abstained from making any inquiry for the purpose of avoiding notice or knowledge. I am of the opinion that so much of the decree as provides for the payment of the amount due on said mortgage to the Philadelphia National Bank, with accrued interest thereon and costs of suit, should be set aside, and that the same should be so modified that the amount due on said mortgage, with interest and costs, should be paid to the complainant.

*For reversal*—THE CHIEF-JUSTICE, ABBETT, DEPUE, DIXON, GARRISON, MAGIE, REED, VAN SYCKEL, LIPPINCOTT, BOGERT, BROWN, CLEMENT, SMITH—13.

*For affirmance*—None.

---

MARY E. FORCE et al., appellants,

*v.*

THE GENERAL PROPRIETORS OF THE EASTERN DIVISION OF NEW JERSEY, respondent.

On appeal from an order advised by Vice-Chancellor Pitney, overruling a plea interposed by the defendants in the court below, in which they insist that "The General Proprietors of the Eastern Division of New Jersey, in the bill of complaint named, are not any natural person or persons, nor any artificial person, nor any body corporate, and, therefore, have no capacity to sue."

Force v. General Proprietors &c.

*Mr. Frederic W. Ward,* for the appellants.

The bill of complaint in this case was filed by the respondent under the name of "The General Proprietors of the Eastern Division of New Jersey."

To this bill of complaint the defendants interposed the plea of *nul tiel* corporation.

The question now presented is the single one of whether the respondent is or is not a corporation.

The bill of complaint contains no allegations upon this subject. It does not even aver that the complainant is a corporation.

The burden of proof in establishing the complainant's corporate existence is upon it.

It is not attempted to show this by any special act or charter of incorporation. Indeed, it is admitted that no such special act or charter exists.

The complainant claims that its corporate capacity arose from the grants made by Charles II. to the Duke of York in 1664, and by the Duke of York to Lord John Berkley and Sir George Carteret.

The complainant offers in evidence various grants, concessions, agreements and other papers made between the year 1664 and the date of what is known as the "Surrender," about the year 1702. The defendants also offered various grants, papers and documents having their origin during the same period.

The first question to be discussed is whether these grants, papers and documents show or prove any corporate existence on the part of the complainant below.

The grant of Charles II. to the Duke of York is of the lands in severalty. The grant by the Duke of York to Berkley and Carteret the same.

There is no grant in any of these papers to a corporation, nor do the papers refer to a corporation.

The grants are of two matters—(1) a grant of certain lands to be held in severalty; (2) a grant of what purports to be powers of government.

As to the first, the grant is of the lands in fee. No words are used to indicate it to be other than an ordinary grant or conveyance of land in fee, and from this grant alone no corporate existence could be inferred.

As to the second, it was insisted or claimed that these powers could be exercised only by a corporation, and the grant, therefore, infers and of necessity created a corporation.

The appellants deny this, and they insist that the powers so granted were but mere powers of appointment delegated by the king; that is, powers to be exercised for, and in the name of the king, never intended to create or authorize the establishment of any separate or distinct organization, and this is demonstrated by the acts of these very parties themselves. Thus we find that Berkley and Carteret, by writing under their individual names, make and issue what is known as their concessions and agreements. *Leam. & Spi. 12.*

By this they separate the government from themselves, placing it in the hands of a governor, a council to be chosen by the governor, and an assembly to be selected by the freemen. And (at *p. 15*) it is provided that these three are to join for the making of laws &c.

Thus by this act they—Berkley and Carteret—in their individual names, create the body which is to exercise, and which in fact did exercise, the powers of government referred to in the grant. True, they refer to themselves collectively in this paper as the "Lords Proprietors," but they do not sign in that name, but, on the contrary, at the commencement of their papers, in nearly every instance, the declaration is "John Berkley and Sir George Carteret, the true and absolute Lords Proprietors" &c., while, in every instance, the signature attached is that of their individual names.

So in their instructions to Philip Carteret, as governor (*Leam. & Spi. 28*), the commencement is the same, and the signatures their individual names. In this paper, also, they give the governor power, with the advice of the council, to dispose of lands, the words used being those constituting a power of attorney—for us and in our names to sell, let &c.

The declaration (at *p. 32*) is also given under their individual hands and seals.

The same is also true of the declaration and directions contained on pages 35 and 37.

The above remarks also apply with equal force to the second grant to the Duke of York, and by the Duke of York to Berkley and Carteret, as contained in *Leam. & Spi. 41–57.*

The quintipartite deed (*Leam. & Spi. 61*) is made between the parties individually. No mention is made of them as Proprietors. The granting part (at *p. 67*) is to George Carteret, his heirs and assigns.

The deeds &c. from Carteret's trustees to the twelve, and by the twelve to twelve others (*Leam. & Spi. 73*), are the same.

After the transfer to the twenty-four by the provisions of the fundamental constitution, the powers of government were again separated and vested in a governor, council, consisting of twenty-four Proprietors and twelve freemen, chosen by the freemen. *Leam. & Spi. 156.*

The laws were to be published and run in the name of the governor, Proprietors and representatives of the freemen of the province. Page 161 provides that in all actions the Proprietors shall be judged after the same manner and liable to the same censure with any other. This paper is signed by fourteen Proprietors.

From this time the Proprietors in their acts do so in all cases in their individual names.

[Here follows references to records &c.]

It is insisted the above demonstrates that the " Lords Proprietors," so-called, never acted as a corporate body. They never used that name, or any other similar name, in the execution of any grant or other paper of any importance on their part. That in almost every instance where that or any other name is used, designating them as a body, the name is used in connection with their individual names.

That so far as they have exercised the powers conferred upon them by the grants named, they treated such power as a delegated one, to be exercised by them individually for and in the name of the king.

But it was insisted in the court below that the grant was a grant of the power of government, to exercise which it was necessary that the grantees should act in a corporate capacity.

The appellants deny this, and respectfully submit that, if the original grant by Charles II. contained the powers of government, these powers did not pass to the Proprietors, being inalienable and incapable of transfer.

That these powers (if the king had the right at all to convey to another such a power) attached only to the person of the original grantee, and was in his hands inalienable and could not be by him transferred.

Thus, if the original grant by the king operated as a transfer of this power to govern, the power attached only to the person, and that person could not transfer it, and it consequently ceased to exist with him.

This question was settled in this very case. Thus, for several years prior to the surrender in 1702, the people of the province had denied the right of the representatives of the Proprietors to govern. Whitehead says (at *p. 110* and following) that in 1685 James II., soon after his accession to the throne, claimed full power over East Jersey, and in 1686 sent over Sir Edmund Andros, commissioned as governor over all New England. That he claimed the right to govern East Jersey, and in April, 1688, the Proprietors surrendered their patent, and Andros seized upon and exercised the powers of government. But upon the accession of William and Mary, Andros was deposed. The Proprietors then again asserted their right to appoint the governor, and did so, and this question continued in dispute from this time until the surrender in 1702. In 1697 the Proprietors appointed one Jeremiah Basse as governor. His right was disputed from the very beginning.

On May 11th, 1698, Lewis Morris appeared in court, then held by Basse and others under the authority of the Proprietors, and demanded of them by what authority they held court. For this he was taken into custody.

It also appears at this time that one Lord Bellamount was governor of New York, acting under commission direct from the

king.   He disputed the right of Basse, as governor of New Jersey, to exercise certain rights relating to the maintenance of a port at Perth Amboy.

This case coming before the Court of Kings Bench (see *Basse* v. *Bellamount, 12 Mod. 399*), the court held the law to be : " If the King grant a tract of land in the plantations abroad to a man, with legislative power, which the grantee passes over to another, the legislative power shall not pass as a privilege annexed to the land, but that remains with the *person* of the grantor."

When, in 1699, the Proprietors presented the name of Governor Hamilton to the lords of trade for confirmation, it was denied, and they were informed a trial of their right to govern had been resolved on.   *Whitehead's East Jersey Under the Proprietors 148.*

The lords of trade resolved to report against this right.   This, Whitehead says (at *p. 151*), brought a crisis in the affairs of the Proprietors, and brought about the agreement to surrender the pretended right to govern.

The lords of trade made their representation (see *Leam. & Spi. 603*), and after reciting the various grants and patents made down to the Proprietors, report on the question under consideration as follows :

" That not being satisfied that the aforementioned grants from the Duke of York (the only title upon which the said Proprietors claim a right to Government), without any direct and immediate authority from the Crown, were or could be of any validity, to convey that right, which we have been informed is a power inalienable from the person to whom it is granted, and not to be assigned by him unto any other, much less divided, sub-divided and conveyed from one another, as has been done in the present case.   We did represent to his Majesty the April 18, 1699, that a trial might be had whereby their claim to the right of Government might receive a determination."

That before this determination could be had, the Proprietors had signified their willingness to surrender their pretended right of government, and the report closes with the recommendation that the surrender be accepted.

Then following the surrender made by the Proprietors in their individual names (*Leam. & Spi. 609*), the acceptance of this sur-

render by the queen (at *p. 617*) recites that the several Proprietors did, in person, present a deed of surrender by them executed under their hands and seals.

It is, therefore, submitted that, by the above authority, acquiesced in by the Proprietors themselves, the power of government contained in said grants was at the most but a personal power, attached only to the persons to whom it was made; that it was inalienable and passed not, and could not pass to their heirs or assigns, but terminated with the death of the person to whom it was granted; that the exercise of such a power did not create a corporation, but if it did, it was a corporation only by necessity, and existed only so long as the necessity existed; that when this power terminated, the corporation, if one existed for the exercise to these powers, terminated also, and if these powers did not terminate with the death of the person to whom they were granted, they unquestionably did terminate upon the surrender in 1702.

Besides the power of government contained in the above-mentioned grants, the only thing which the Proprietors claimed, or could claim thereunder, were the lands thereby granted, and after the surrender these lands alone remained to them, and the powers to be exercised were only those which related to the care, management and disposal of these lands.

The question then arises whether there is anything in this or in the other evidence offered by the complainant below which shows or proves any corporate capacity on the part of the complainant.

The appellants claim that not only does this evidence fail to show the existence of such a corporate existence, but, on the contrary, expressly shows the reverse to be the case.

As to the grants above referred to, it is the well settled law of this state that these grants operated to vest in the Proprietors the fee of the soil, and that they held this not as a corporation, but as tenants in common. *Arnold* v. *Mundy, 1 Halst. 1; Estell* v. *Bricksburg Land and Improvement Co., 6 Vr. 235.*

It is submitted that, as tenants in common, they were required to exercise no corporate rights. No corporate capacity will be presumed. It must be shown affirmatively to exist.

The facts in this case show that until within a very recent time the Proprietors have not regarded themselves as a corporate body, entitled to maintain a suit, but have considered the reverse to be the case; the question then remains whether, in spite of all these facts, they are or can be such by operation of law.

It is admitted that this body has no special charter, and if it is a corporation, or a *quasi*-corporation, its corporate existence must arise (1) by implication or (2) by presumption, or in some other manner by which the law would infer a corporate capacity.

But the appellants say that if a corporation is to be presumed it must be from the long-continued exercise of corporate rights; that is, the evidence must be of the performance of corporate acts which could not be performed by individuals. For it is said, " that if the acts of a company or association, however long standing, are such only as might be performed by an unincorporated company, corporate existence will not be presumed therefrom." *Beach Corp.* § *874; Waterm. Corp.* § *38; Greene* v. *Dennis; 6 Conn. 292.*

Individuals acting together for the benefit of a society are not to be considered as a corporation.    *Ernot* v. *Bartle, 1 Johns. Cas. 319.*

To entitle the complainant to its claim under this head it must prove the exercise of corporate acts—*i. e.,* acts which a corporation could alone perform.

Applying this doctrine to this case, the appellants say the evidence in this case fails to show a single act on the part of the proprietors during all their meetings from 1725 to the present time, which is entitled to be considered as a corporate act which only a corporation could do—but, on the contrary, every one of these acts have been in an individual capacity.

The only thing which could be claimed as a corporate act is the fact of their meeting. But it is insisted that, while this is some evidence of a corporate existence, it is not decisive. But the true question is whether the acts done at such a meeting were corporate acts; that is, such acts as could alone be performed by a corporation.

*Mr. Richard V. Lindabury,* for the respondent.

1. Respondent is a corporation.

(*a*) It is such by express grant.

The grant of Charles II. to the Duke of York and his assigns, and the release of the latter to Berkeley and Carteret in the year 1664, and especially the release of the Duke of York to the twenty-four Proprietors, and the confirmation of the same by the king in 1682, constituted the Proprietors a corporation.

These grants bestowed upon the Proprietors not only the power to possess and dispose of land, but also the fullest powers of government.

They thereupon became a corporation by implication *virtute officio.*    *1 Bl. Com. 472; 1 Morawetz Corp.* § *2.*

In *2 Kent Com. 276,* it is said:

"There is no particular form of words requisite to create a corporation. A grant to a body of men to hold mercantile meetings has been held to confer a corporate capacity. A grant to a county or hundred rendering rent, would create them a corporation for that single intent, without saying to them, and their successors."

Berkeley and Carteret adopted a joint seal and acted as an individual during the whole period of their joint propriety. *Leam. & Spi. 26, 27 &c.*

They established a method of conveying land by patent (*Leam. & Spi. 35*), which continued until the surrender.

In 1684 the twenty-four Proprietors established a committee of nine with authority to act for the whole. *Leam. & Spi. 195.*

They also adopted and used a corporate seal and acted in all things as a corporation. *Archives vol. 1 pp. 488, 499; vol. 2 p. 1.*

In the surrender proceedings the old grant to the Proprietors is treated as a "charter," and reference is made to what shall be contained in their "new charter." *Leam. & Spi. 594, 598.*

By the surrender the Proprietors did not lose their corporate existence. They were established to hold and convey land as well as to govern, and their surrender of the latter function did

not destroy either their right or capacity to discharge the former in as full and ample a manner as they had theretofore.

(b) It is a corporation by prescription.

The agreement of 1725 was the exercise of a corporate function.

From the time of that agreement to the present the Proprietors have acted as a corporation.

They have had a president, vice-president, secretary, treasurer and executive committee, called a council, and have acted in all things as a unit.

The only suit they appear to have ever had they brought as a corporation.

In *Providence Bank* v. *Billings, 4 Pet. 562*, Chief-Justice Marshall said : " The great object of a corporation is to bestow the character and property of individuality on a collective and changing body of men."

The establishment of a precisely similar council in West Jersey (*Smith's History 199*) was held to be a corporate act and to constitute the Proprietors a corporation by Mr. Justice Bradley, in *Baeder* v. *Jennings, 40 Fed. Rep. 205*.

This counsel established in this way has been recognized by the legislature of this state in various acts, notably in one passed in 1787, and now forming section 25 of the Limitation act. *Rev. p. 599*.

In *Field Corp. 19*, it is said :

" It has been held in this country that the exercise of corporate powers for a long time (twenty years) without objection, and with the knowledge and assent of the Legislature of the State, forms conclusive evidence of a charter, or constitutes a corporation by prescription, which supposes an original grant."

See, also, *Ang. & A. Corp. p. 186 § 214*.

2. Complainant is a corporation by the name by which it sues.

It was called by that name in the instructions to Lord Cornbury in 1702. *Leam. & Spi. 628*.

The same title is used in the instructions to Lovelace in 1708, to Hunter in 1709 and to Morris in 1738. *Archives vol. 3 p. 316; vol. 4 p. 2; vol. 6 p. 48*.

Force *v.* General Proprietors &c.

The Proprietors call themselves by that name in the agreement of 1725.

They are also called by that name in the bill in chancery in 1745.

They are called that in an act passed in 1719. *Pat. L. p. 7.*

In an act passed in 1787 they are again called General Proprietors and referred to as having *successors. Rev. p. 599* § *25; Pat. L. p. 99.*

In an act passed in 1794 (*Pat. L. p. 124*) they are again called the General Proprietors.

In an act passed in 1799 (*Pat. L. p. 571; Rev. p. 805* § *44*) they are again called the General Proprietors.

See, also, Journal &c. House of Representatives, 1703, First Assembly, published by the State of New Jersey in 1872, at pp. 23, 26, 27, 65, 69, 70, 78, 107.

In *Ang. & A. Corp. p. 185* § *214*, it is said that Proprietors are a corporation by the name by which they are known and called in their own records.

In *Dutch West India Company* v. *Henriques Van Moses, 1 Str. 612*, it was adjudged that if no name be given to a company or corporation at their foundation, they may collect a name by reputation by which they may sue or be sued.

In *Dew* v. *Hilmes, Penn. 1056,* the same doctrine is declared.

PER CURIAM.

Decree affirmed.

*For affirmance*—THE CHIEF-JUSTICE, DEPUE, GARRISON, MAGIE, REED, VAN SYCKEL, BOGERT, BROWN, CLEMENT, SMITH—10.

*For reversal*—None.